******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

CARVAUGHN JOHNSON *v.* COMMISSIONER
OF CORRECTION
(AC 36185)

Beach, Keller and Mullins, Js.

*Argued December 10, 2015—officially released June 14, 2016*

(Appeal from Superior Court, judicial district of
Tolland, Cobb, J.)

*James A. Killen*, senior assistant state's attorney,
with whom, on the brief, were *Michael Dearington*,
state's attorney, and *Adrienne Maciulewski*, deputy
assistant state's attorney, for the appellant
(respondent).

*Damon A. R. Kirschbaum*, with whom, on the brief,
was *Vishal K. Garg*, for the appellee (petitioner).

*Opinion*

KELLER, J. Upon a grant of certification to appeal, the respondent, the Commissioner of Correction, appeals from the judgment of the habeas court granting in part the amended petition for a writ of habeas corpus filed by the petitioner, Carvaughn Johnson. The respondent claims that the court improperly concluded that the petitioner proved a violation of his right to a fair trial because he did not receive effective assistance from his trial counsel. We agree with the respondent and, accordingly, reverse in part the judgment of the habeas court.

The following procedural history underlies this appeal. Following a jury trial, the petitioner was convicted of murder in violation of General Statutes § 53a-54a (a) and carrying a pistol without a permit in violation of General Statutes § 29-35. The petitioner was sentenced to a total effective term of imprisonment of forty-three years. The petitioner brought a direct appeal to our Supreme Court, which affirmed the judgment of conviction. *State* v. *Johnson*, 288 Conn. 236, 951 A.2d 1257 (2008). Our Supreme Court set forth the facts that reasonably could have been found by the jury in returning its verdict: "The [petitioner] shot and killed the sixteen year old victim, Markeith Strong, on the evening of October 10, 2001, in New Haven. In the weeks prior to that evening, the [petitioner] and the victim had been at odds with each other. Approximately three weeks prior to the shooting, the victim's teenage sister, L'Kaya Ford, was sitting with the victim at the corner of Read and Shepard Streets when she observed the [petitioner] approach.[1] The [petitioner] walked toward Ford and the victim, called the victim 'a punk,' and threatened to assault him. The victim said nothing, and the [petitioner] walked away.

"The victim next encountered the [petitioner] in the late afternoon of September 29, 2001, and the two engaged in a dispute over a bicycle. The victim and Ralph Ford[2] were around the intersection of Read and Shepard Streets, where the victim either was riding his bicycle or standing near it, when the [petitioner] stopped him, declared that the bicycle belonged to him and demanded that the victim give it to him. The victim refused and informed the [petitioner] that he had found the bicycle about one month earlier and had fixed it up. The victim told the [petitioner] that he owned the bicycle. The [petitioner] asked for the bicycle a second time, and, when the victim refused, the [petitioner] said, '[d]on't make me do something to you.' The [petitioner] then punched the left side of the victim's head twice, which caused a small cut near the victim's left ear. During this encounter, the [petitioner] may have been carrying a gun.[3] The [petitioner] then took the bicycle and rode away.

"After this encounter, the victim, accompanied by Ralph Ford, returned home, where his family contacted the New Haven police to report the incident. After speaking with the victim, the police officers radioed a description of the [petitioner] and notice of a possible robbery and larceny. The police did not apprehend any suspect that day. Over the next few days, the [petitioner] approached the victim and L'Kaya Ford about the police report, asserted that he was not going to jail, apologized to the victim and told him not to press charges. Toward the end of September, the [petitioner] also expressed concern to his friend, Tashana Milton Toles, about the possible criminal charges that he faced as a result of the bicycle incident and specifically remarked to her that he thought he might be going back to jail.

"On the morning of October 10, the [petitioner] approached L'Kaya Ford while she was waiting for a bus. The [petitioner], who was driving a black car that L'Kaya Ford described as an Acura or Ford Probe, pulled the car alongside of her and accused her of being a snitch. The [petitioner] insulted her, told her he did not like snitches and that she knew what happened to 'snitches in the hood.' That night, the victim, L'Kaya Ford, Ralph Ford, and other friends gathered on the corner of Read and Shepard Streets to celebrate L'Kaya Ford's birthday. Some of the group, but not Ralph Ford or the victim, were drinking alcohol and smoking marijuana. Around 10 p.m., the victim and Ralph Ford departed together. The neighborhood around Read, Shepard, Huntington and Newhall Streets affords many shortcuts through the yards of houses that are occupied by neighborhood residents. On that night, however, Ralph Ford did not take his usual shortcut but parted from the victim, who took the shortcut home. Ralph Ford then continued walking alone on Read Street and proceeded around the corner to his house on Newhall Street.[4] Upon arriving at his house, Ralph Ford heard a gunshot coming from the backyard of the house across the street. Ralph Ford then entered his front hallway. Ralph Ford heard someone running from the yard across the street and saw the [petitioner] run into the driveway leading to Ford's house.[5] Ralph Ford saw the [petitioner] carrying a semiautomatic handgun and entering a black Acura as it exited the driveway.[6] James Baker, who lived near the crime scene, heard someone run past his window, jump the fence outside his house and head into the backyard, toward Huntington Street. Approximately five minutes later, and around 10:20 p.m., Baker heard a single gunshot coming from behind his house. LaMont Wilson, who had left the group earlier than Ralph Ford and the victim, lived on Read Street and also heard a gunshot from the direction of his backyard, sometime between 10 and 10:45 p.m. Baker called the police at approximately 10:45 p.m. to report the gunshot but did not initially identify himself because he feared retaliation from 'certain individuals' for con-

tacting the police. Joanie Joyner, a resident of Huntington Street and the victim's next-door neighbor, also heard a loud 'boom' from the direction of her backyard and then, sometime after 11 p.m., saw something in her yard. At approximately 11:25 p.m., she also called the police.

"The [petitioner] contacted Toles by telephone between 9:45 and 10 p.m., told her that he was about five minutes away from her dormitory at Southern Connecticut State University, and asked if he could visit her. Toles agreed. The [petitioner] did not arrive at the dormitory until 11 p.m., at which time he phoned Toles from the lobby, and she came down to the lobby to register him as a visitor at the security desk.[7] The [petitioner] was with a friend, Travis Scott.[8] To enter the dormitory, the [petitioner] was required to provide identification at the security desk where security personnel record the information. The sign-in sheet at Toles' dormitory indicated that she signed the [petitioner] into her building at 11:10 p.m. Shortly after they signed in, a fire alarm required all residents and visitors to evacuate the building. The alarm occurred at approximately 11:30 p.m., and the fire department and university police responded to the scene. The [petitioner] and Scott waited with Toles and her roommate until the university permitted students to reenter the building. They retrieved their identification from the security desk and departed. During the investigation, Detective Daryl Breland of the New Haven police department drove from Ralph Ford's house to Toles' dormitory, recorded the distance to be about three miles and noted that the trip took approximately ten minutes.

"Officers Mark Taylor and Brian Pazsak of the New Haven police department were on patrol in the Newhall and Huntington Street area on the night of October 10, 2001, and received the dispatch related to Baker's and Joyner's calls. Police responded first to Baker's call and investigated the general area, but saw nothing amiss. After responding to Joyner's call around 11:35 p.m., the officers found the victim lying face down in Joyner's backyard. The victim appeared to be unconscious and bleeding from the mouth. The officers also found a spent nine millimeter shell casing nearby. New Haven fire department personnel were called but were unable to resuscitate the victim, who was pronounced dead at the Hospital of Saint Raphael in New Haven.

"Arkady Katsnelson of the chief medical examiner's office performed an autopsy of the victim on October 11, 2001, and determined that he had died of a single gunshot wound to the right side of his face.[9] Katsnelson concluded that the bullet penetrated the victim's face and neck, and completely severed the spinal cord, instantly incapacitating the victim." (Footnotes in original.) Id., 239–43.

Thereafter, the petitioner brought an amended peti-

tion for a writ of habeas corpus in which he raised two types of claims. In the first count of his petition, the petitioner alleged that his right to conflict free trial counsel had been violated because his trial counsel, Scott Jones and Beth Merkin, had an actual conflict of interest that adversely affected their performance. In the second count of his petition, the petitioner alleged a violation of his right to the effective assistance of counsel. The second count involved trial counsel's failure to present (1) a third party culpability defense and (2) an alibi defense that explained his whereabouts at the time of the shooting. With respect to the third party culpability defense, the petitioner alleged that his trial counsel had "failed to adequately cross-examine Ralph Ford about . . . his possession of a pistol that was consistent with the pistol that discharged the bullet that killed the victim in the days before the shooting; and . . . about his prior statement that he did not see anything on the night of the shooting, and that he felt pressure from the police, the victim's family, and his family to implicate the petitioner in the shooting . . . ." Also, the petitioner alleged that his trial counsel had "failed to present the testimony of William Holly about Ralph Ford's possession of a pistol that was consistent with the pistol that discharged the bullet that killed the victim in the days before the shooting . . . [and] they failed to present the testimony of . . . Matthew Whalen [an investigator for the public defender's office] about William Holly's statement that he saw Ralph Ford in possession of a pistol that was consistent with the pistol that discharged the bullet that killed the victim in the days before the shooting . . . ."[10] With respect to the alibi defense, the petitioner alleged that his trial counsel had "failed to present the testimony of Joyce Johnson, the petitioner's sister, about the petitioner's presence at their home at the time of the shooting; and . . . they failed to present the testimony of Taylor Allen about the petitioner's presence at his home at the time of the shooting."

The respondent denied that the petitioner's right to conflict free representation had been violated or that he had been denied his right to effective representation at trial. Additionally, the respondent raised the special defense of procedural default with respect to both counts of the petition for a writ of habeas corpus. In a reply to the respondent's return, the petitioner denied the special defense.

Over the course of five days, the habeas court held an evidentiary hearing with respect to the claims set forth in the petition. In addition to other evidence, the petitioner presented testimony from Jones; Merkin; Holly; Thomas Farver, former counsel for Holly; Whalen; Johnson; Allen; Gerard Petillo, a firearms examiner and shooting incident reconstruction consultant; and Thomas Ullmann, public defender for the New Haven judicial district who supervised Jones and Mer-

kin in their trial representation of the petitioner. The respondent presented testimony from Marc Caporale and Breland, former detectives with the New Haven Police Department who had been involved in the investigation into the victim's death. At a separate, subsequent hearing, the court heard lengthy closing arguments, which was followed by the parties' submission of post-trial briefs.

In a thorough memorandum of decision, the habeas court ruled in favor of the respondent with respect to the conflict of interest claim. With respect to the ineffective assistance claim, the court determined that the petitioner's right to the effective representation of counsel had been violated by counsel's failure to present a third party culpability claim and by counsel's failure to present an alibi defense.

The habeas court set forth the following findings of fact: "In the petitioner's first criminal trial, the court declared a mistrial due to a hung jury. The state presented testimony at the first criminal trial from an eyewitness, Ralph Ford, who testified consistent with his statements to the police that he heard a gunshot and saw the petitioner run out of the backyard across the street carrying a black gun in his hand. At the first trial, trial counsel presented a partial alibi defense with testimony indicating that the petitioner was at Southern Connecticut State University around 11 p.m. on the night of the murder. [The defense] did not explain the petitioner's whereabouts between 10 and 11 p.m. After the first trial resulted in a hung jury, a juror indicated that it would have been helpful for the jury to know where the petitioner was at the time of the shooting [which occurred] prior to 11 p.m.

"At the petitioner's second criminal trial, the state's key witness, Ford, recanted his prior statement and testimony that he had seen the petitioner running from the crime scene with a gun. Instead, Ford testified that the police forced him to make those statements. Ford's prior inconsistent statements at the first criminal trial were admitted for substantive purposes in the second criminal trial pursuant to [the doctrine set forth in *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986)].

"At the second trial, trial counsel's defense strategy was that the state failed to prove the petitioner's guilt beyond a reasonable doubt, that Ford was not credible, and that it was Ford that had accidentally shot the victim, who was Ford's friend. The petitioner's trial attorneys disagreed over whether to present an alibi, including the petitioner's whereabouts between 10 and 11 p.m. or a third party culpability defense; Attorney Jones wanted to present both defenses and Attorney Merkin did not. Attorney Merkin prevailed and trial counsel did not present either defense at the second trial." (Footnote omitted.)

In addressing the aspect of the petitioner's ineffective assistance of counsel claim that involved the failure of his trial counsel to present evidence in support of a third party culpability defense, the court set forth relevant legal principles and stated in relevant part: "The petitioner claims that trial counsel were ineffective for failing to call Holly or Inspector Whalen as witnesses to support the theory that Ford accidentally committed the murder, or investigate whether Holly could identify a photograph of the pistol as being the weapon he saw Ford in possession of [on] the day of the shooting. . . .

"At the second criminal trial, the state established that the bullet recovered from the victim was from a Hi-Point nine millimeter pistol or semiautomatic rifle. At the habeas trial, the petitioner established that Ford showed Holly a black handgun that Ford had tucked into the waistband of his pants on the afternoon of the shooting. Holly believed that a photograph of the Hi-Point nine millimeter pistol used in the shooting looked like the gun that he saw Ford carrying. The murder weapon and Ford's gun both had ridges above the handle, and ridges were not a common feature on the guns that Holly had seen.

"The petitioner's trial attorneys disagreed as to whether the third party culpability defense should be presented to the jury. Attorney Jones believed that Holly's testimony should have been presented and Attorney Merkin did not, even though she admitted that Holly's testimony was consistent with the defense theory of the case, which was that Ford accidentally shot the victim. The court finds the third party culpability defense consisting of the facts that (1) Ford had been the last person seen with the victim, (2) was in close proximity to the location of the shooting at the time of the shooting, and (3) had been seen with a gun matching the description of the murder weapon on the day of the shooting, were consistent with and relevant to the defense theory that it was Ford who shot the victim by accident.

"Both Attorney Jones and Attorney Merkin thought that they would not be able to present Holly's testimony without Ford first admitting that he knew Holly. Trial counsel believed, incorrectly, that they needed, and did not have, a foundation to introduce third party culpability evidence—that is, the testimony of Holly—once Ralph Ford denied knowing Holly while on the witness stand at the petitioner's criminal trial. At the habeas trial, Attorney Merkin conceded that the presentation of Holly's testimony was not contingent upon Ford admitting that he knew Holly. The issue with presenting testimony supporting a third party culpability defense is not about presenting a foundation for admitting the evidence; it is about the petitioner's constitutional right to present a defense and relevant evidence in support of that defense. . . .

"[T]he standard for determining whether evidence of third party culpability is admissible is whether the presented evidence is relevant. Here, it was. Holly's testimony regarding Ford's possession of the same type of gun that was used to kill the victim on the day of the shooting, as well as other facts pointing to Ford as the shooter, would have established the necessary factual nexus for a third party culpability claim regardless of whether Ford knew Holly. The court finds it reasonably likely that the trial court would have allowed Holly's testimony.

"The [respondent] argues that Attorney Farver communicated to the court on Holly's behalf that Holly would assert his fifth amendment privilege and refuse to testify if he was called [as a witness]. However, both Attorney Farver and Attorney Merkin testified that they were uncertain that Holly would have been permitted to invoke his fifth amendment privilege at the petitioner's criminal trial due to the fact that Holly's pending charges were unrelated to the petitioner's case. At the criminal trial, Farver reported to the court: 'I met with Mr. Holly this morning and discussed with him his rights and whether to testify or not to testify if called upon to do so. I explained to him, if he, well, first of all, let me say that he does not wish to testify. It is his position at this point as he expressed to me that he, first of all, would exercise a fifth amendment right, although I candidly don't know how far the testimony or the inquiry would be going [or] whether he has such a right. Quite honestly, I know that he has pending charges of his own here in the courthouse. I don't believe those are related to this case. However, he would first of all have to assert a fifth amendment right. The court may choose to find that he does not have a fifth amendment right as to this particular information that is being sought. If the court were to rule in that fashion and order him to testify, I have explained to him that he could be found in contempt of court if he continues to decline to testify; he has indicated to me that his position would still be that he would refuse to testify because he has pending charges and he does not want to testify.' . . .

"In the present case, Holly's pending charges were unrelated to the petitioner's case, and there is no indication that Holly's testimony that he saw Ford with a gun on the day of the shooting would have exposed him to any criminal prosecution in the petitioner's or any other case. Fear of potential prosecutorial retaliation in an unrelated case does not constitute sufficient grounds to invoke the fifth amendment, as it is a mere subjective belief, not a reality, and the actual testimony would not have been incriminating in any way. Therefore, the court finds that it is not reasonably likely that Holly would have been permitted to invoke his privilege against self-incrimination in the petitioner's criminal

case had trial counsel proffered him as a defense witness to support the third party culpability defense. . . .

"In the present case, the court finds that trial counsel was deficient for not pursuing the petitioner's third party culpability defense because it was supported by a neutral, credible witness, and the evidence was relevant to the central issue of whether a reasonable doubt existed as to whether the petitioner committed the crime. . . . [I]n light of all of the circumstances here, particularly the recanted testimony of Ford, whose testimony served as the state's primary evidence, and the facts pointing to Ford's culpability, trial counsel's failure to . . . present the third party culpability defense fell below an objective standard of reasonableness, and therefore constitutes deficient performance pursuant to [*Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)].

"The court also further finds that trial counsel's failure to present the third party culpability defense prejudiced the petitioner because there is a reasonable probability that the outcome of the proceedings would have been different had the defense been presented to the jury. As a result, the court finds that the petitioner has satisfied the prejudice prong of *Strickland* as to this claim." (Citations omitted.)

In addressing the aspect of the petitioner's ineffective assistance of counsel claim that involved the failure of his trial counsel to present evidence in support of an alibi defense that involved the testimony of Johnson and Allen to explain his whereabouts at the time of the shooting, the court set forth relevant legal principles and stated in relevant part: "The petitioner claims that trial counsel were ineffective for failing to call Johnson and Allen as witnesses to testify that he was home at the time of the shooting in support of an alibi defense. The court agrees with the petitioner on this claim. . . .

"The petitioner's trial counsel [was] aware of the two alibi witnesses, Allen and Johnson, who could testify as to [the] petitioner's whereabouts between 10 and 11 p.m. on the evening of the shooting, but disagreed as to whether an alibi defense should be presented. They were also aware that the jury in the first trial wanted to know where the petitioner was between 10 to 11 p.m. Attorney Jones wanted to present the alibi defense because he believed the witnesses were credible and their testimony explained the petitioner's whereabouts at the time of the shooting in response to the first jury's concerns as to where the petitioner was between 10 and 11 p.m. Attorney Merkin does not like alibi defenses generally, and her practice was not to present an alibi defense unless it was rock solid. Attorney Jones conceded to Attorney Merkin's decision to not present the alibi defense because she was more senior to him.

"At the second criminal trial, James Baker, a Read

Street resident, testified that at 10:20 p.m., he heard a gunshot. Baker did not call the police until 10:45 p.m. Prior to the petitioner's first criminal trial, Attorney Merkin had inaccurate information about the time of the shooting. She mistakenly believed that the shooting occurred at 10:45 p.m. Counsel's notice of alibi, dated July 29, 2003, inaccurately reported that Baker called the police at 10:45 p.m., immediately after the shooting occurred. It was only when Baker testified at the petitioner's first criminal trial that counsel became aware that the correct time of the shooting was 10:20 p.m.

"Johnson and Allen testified credibly at the habeas trial as to the petitioner's whereabouts on the night of the shooting. Johnson testified that the petitioner was home between 5 and 11 p.m. on the night of the shooting. During that time, Johnson was home with her young son and was for the most part in the living room in the front of the apartment watching television. From her position, she would have been able to see if the petitioner had left the house during that time. At some point, Johnson was aware that the petitioner and his friend were at the house and ordered a pizza. The living room had two large windows facing the driveway, and any movement outside would have activated the motion sensor lights in the driveway. If the petitioner had left through the back door, Johnson would have heard him because that door screeched loudly when [it was] opened. At approximately 11 p.m., Johnson heard a horn honk outside, and she saw the petitioner leave the house with Allen.

"Allen, who also testified at the habeas trial credibly, called the petitioner's cell phone at 10:20 p.m., and he asked her to call his home telephone number. Allen immediately hung up and called the petitioner at home on his landline. Allen and the petitioner spoke for approximately ten to fifteen minutes on the petitioner's home phone. The petitioner then called Allen again from his home telephone around 10:40 p.m. or 10:45 p.m. Shortly thereafter, Allen drove to the petitioner's home, picked him up at approximately 10:50 p.m. or 10:55 p.m. and drove him to Southern Connecticut State University.[11] The court finds that the testimony of Allen and Johnson would have been helpful to the petitioner's defense.

"Inspector Whalen testified that he interviewed Allen and Johnson. Johnson informed him that the petitioner was at home with a friend on the night of the shooting and someone picked the petitioner up between 10:45 p.m. and 11 p.m. Allen told Inspector Whalen that she called the petitioner at his home at 10:20 p.m., and she picked the petitioner up around 10:35 p.m. or 10:40 p.m. to drive him to Southern Connecticut State University. At the time of his interview with Allen, Inspector Whalen was aware of the fact that the victim was shot at 10:20 p.m. Inspector Whalen reported the information

he received from Johnson and Allen to the petitioner's trial counsel.

"Trial counsel also had the partial alibi presented at the first criminal trial of Toles, who testified that the petitioner arrived at the Southern Connecticut State University to visit her at approximately 11:10 p.m. on the night of the shooting.

"The court finds that trial counsel was aware of the statements of Johnson and Allen, that their testimony was credible and that production of such testimony at trial would have been helpful to the defense. . . .

"[H]ere, trial counsel's decision to not call the alibi witnesses was not based on the witnesses' credibility. Both Attorney Jones and Attorney Merkin found Johnson and Allen to be credible witnesses. Moreover, the court finds that their testimony would have been helpful to the petitioner's defense that he was home at the time of the shooting.

"Attorney Merkin decided to not present Johnson's testimony because she was related to the petitioner, the shooting occurred in close proximity to the petitioner's home and it was unclear whether the petitioner was in her direct vision for the entire evening. Attorney Merkin did not present Allen's testimony because she believed that Allen estimated the times of the phone calls, and the petitioner's close proximity to the crime scene would have allowed him to commit the murder despite receiving and making the phone calls at the times indicated by Allen. Trial counsel acknowledged at the habeas trial, however, that they failed to investigate Johnson's ability to provide an alibi at the times when the petitioner was not in her direct view. Johnson testified that the motion sensor lights and the screeching back door would have prevented the petitioner from leaving the house without Johnson's knowledge. Moreover, the times of the phone calls between Allen and the petitioner were seen on Allen's caller identification. That evidence, if presented, would have established that the petitioner was at home using his landline at the time the shooting occurred. Further, while Attorney Merkin was concerned that the alibi defense would place the petitioner in close proximity to the crime scene, there was already evidence before the jury that the petitioner was at Southern Connecticut State University, close to the crime scene, shortly before 11 p.m. on the night of the victim's murder. In addition, the evidence from the three alibi witnesses covered the time period between 10 and 11 p.m., making it highly unlikely that the petitioner could have committed the shooting.

"The court is particularly influenced by the fact that when trial counsel decided not to submit the petitioner's alibi, they were aware that the first jury was conflicted about the petitioner's guilt, which resulted in a hung

jury, and [counsel] knew that the first jury wanted to know where the petitioner was at the time the shooting occurred. While each jury is different, having this information in the petitioner's second criminal trial was a significant bonus to the defense and should have been utilized in determining whether to pursue the alibi defense.

"Pursuant to the foregoing, the court finds that in light of the circumstances in this case, and the credible evidence presented, it was not objectively reasonable for trial counsel to not present the alibi witnesses. The court had the opportunity to hear and to evaluate the two witnesses, and found their testimony to be credible and compelling and [that the testimony] would have been helpful to the petitioner's case. . . . Trial counsel also found the alibi witnesses to be credible, and that their testimony would have been helpful to the petitioner's defense. Accordingly, the court concludes that the petitioner has met his burden to prove that counsel's conduct was constitutionally deficient under the performance prong of *Strickland*.

"The court also finds that trial counsel's failure to call the alibi witnesses prejudiced the petitioner because there is a reasonable probability that the outcome of the proceedings would have been different had it not been for the deficient performance. The court finds that the testimony from Johnson and Allen likely would have affected the verdict, especially in light of the weakness of the state's case and the fact that the jurors at the first criminal trial that resulted in a hung jury were interested in where the petitioner was at the time of the shooting. As a result, the court finds that the petitioner has satisfied the prejudice prong of *Strickland* as to this claim." (Citations omitted; footnote added.)

The court denied the petition with respect to the conflict of interest claim, and granted the petition with respect to the ineffective assistance of counsel claim. The court vacated the judgment of conviction and returned the case to the trial court for further proceedings. Later, the court granted the respondent's petition for certification to appeal, and this appeal by the respondent followed.

The habeas court's memorandum of decision reflects that it considered and analyzed separately each of the two grounds alleged in the petitioner's claim in which he alleged that he had received ineffective assistance from his trial counsel. The court determined that the petitioner had satisfied his burden under *Strickland* with respect to his claim that counsel had failed to present certain evidence in support of a third party culpability defense and with respect to his claim that counsel had failed to present an alibi defense that explained his whereabouts at the time of the shooting. Because the habeas court's judgment rests upon either

of these grounds, it is the respondent's burden on appeal to demonstrate that the habeas court erroneously ruled as it did with respect to both grounds.

"When reviewing the decision of a habeas court, the facts found by the habeas court may not be disturbed unless the findings were clearly erroneous. . . . The issue, however, of [w]hether the representation [that] a defendant received at trial was constitutionally inadequate is a mixed question of law and fact. . . . As such, that question requires plenary review by [a reviewing court] unfettered by the clearly erroneous standard. . . .

"A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. . . . This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . .

"As enunciated in *Strickland* v. *Washington*, [supra, 466 U.S. 687] . . . [a] claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . A court can find against a petitioner, with respect to a claim of ineffective assistance of counsel, on either the performance prong or the prejudice prong . . . ." (Citations omitted; internal quotation marks omitted.) *Michael T.* v. *Commissioner of Correction*, 319 Conn. 623, 631–32, 126 A.3d 558 (2015).

I

First, we consider the respondent's claim that the habeas court erroneously concluded that the petitioner was deprived of his right to effective assistance of counsel by his counsel's failure to present testimony from Holly in support of a third party culpability defense. As discussed previously in this opinion, this evidence is centered on the testimony of Holly. We agree with the respondent.

The respondent challenges the court's decision with respect to the third party culpability defense on several grounds. With regard to the court's evaluation of the performance of trial counsel, the respondent argues that it did not afford adequate consideration to the evidence that defense counsel's failure to present Holly's testimony in support of the third party culpability

defense was the result of reasonable trial strategy rather than deficient representation. In this respect, the respondent focuses on evidence presented at the habeas trial that supported a finding that defense counsel, in crafting a sound trial strategy, did not want to divert the jury's attention from the weaknesses in the state's case, particularly, the significance of Ford's recantation. With respect to the prejudice prong of *Strickland*, the respondent argues: "[I]n evaluating prejudice from the defense team's decision not to call Holly to the [witness] stand at the criminal trial, the habeas court erred in concluding that the petitioner met his burden of establishing that Holly's testimony carried no possibility of self-incrimination and that, therefore, Holly's fifth amendment privilege would not have been an impediment to his testimony." The respondent argues that the court erroneously concluded that there was a reasonable likelihood that the outcome of the trial would have been different if the evidence at issue had been presented by the defense.

Assuming but not deciding that defense counsel's failure to attempt to present evidence from Holly in support of a third party culpability defense was the result of representation that was not reasonably competent, we nonetheless conclude, under the prejudice prong of *Strickland*, that the petitioner failed to demonstrate that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

We turn to the findings of the habeas court as well as some of the pertinent evidence that was not in dispute. The habeas court found, and the record reflects, that when the issue of Holly's testimony was first raised at the time of the criminal trial at a posttrial hearing on the petitioner's motion for a new trial, Holly's counsel, Farver, communicated to the court that Holly did not wish to testify, that he intended to exercise his fifth amendment right to remain silent and that, even if the court ordered him to testify, he would decline to do so. Farver communicated to the court that his client's position was based upon the fact that he had criminal charges pending against him.

At the habeas trial, Holly testified that at the time of the petitioner's trial, he was incarcerated in Connecticut and had a case pending in the New Haven courthouse, in which proceeding he was represented by Ullmann. Holly testified that with respect to his testifying at the petitioner's criminal trial, Ullmann and Farver had advised him to invoke his right to remain silent. Holly testified that, later, Farver was appointed to represent him in connection with his potential involvement in the petitioner's trial. Holly testified that he communicated to Ullmann and Farver that he would not testify. He testified, however, that, if he had been ordered to do so, he would have testified consistent with the testi-

mony that he provided before the habeas court in the present case because, if a court determined that he could not invoke his right to remain silent, he would not have had a choice in the matter. Holly explained that one of the reasons why he did not want to testify was because he feared that the prosecutor, who was involved in the petitioner's trial and in a then pending investigation of Holly for the crime of murder, would retaliate against him. He stated, however, that he did not believe that his testimony in the petitioner's case would incriminate him.

At the habeas trial, Ullmann testified that he represented Holly between 2002 and 2005, the time period which encompassed the petitioner's second criminal trial. He testified that he represented Holly with respect to a variety of charges that, following a plea negotiation, resulted in a conviction of robbery in the first degree and assault on a peace officer. Also, he testified that, at times relevant, he was representing Holly with respect to "some other [legal] issues," as well. Ullmann testified that he became aware that Holly had information that might be relevant to the petitioner's case and that members of the petitioner's defense team wanted to speak with Holly, at which time Ullmann informed Whalen that he was representing Holly in relation to a pending murder investigation and that he had advised Holly not to speak with him. Ullmann testified that he understood the information to involve Holly's observation of a potential killer who was armed.

Ullmann testified that, later, he arranged for Farver to represent Holly solely with respect to Holly's potential involvement in the petitioner's trial, but that he continued to represent Holly with respect to his pending charges as well as the murder investigation. With respect to his concern about Holly's cooperation with the petitioner's defense and the importance of providing the petitioner with representation concerning that issue, he stated: "I'm obviously representing somebody who's facing serious criminal charges, who's being investigated for something else, and I'm [given] this information about [the desire of the petitioner's trial attorneys] to put him on the [witness] stand in relation to some gun. I'm not letting them talk to him." Ullmann continued, "there's the potential that William Holly could incriminate himself or hurt his situation in the pending case that . . . I was representing him on." Additionally, Ullmann explained that he was motivated by a concern that Holly's cooperation with the defense or his testimony in the petitioner's case could subject him to retaliation by the prosecutor with respect to his "very serious" pending criminal matters.

At the habeas trial, Farver testified that, during conversations with Holly concerning his involvement in the petitioner's trial, Holly unequivocally stated to him that he intended to invoke his right to remain silent and

that, even if he were ordered to testify, he would decline to do so. Farver testified that he was unsure whether, at the time that he represented Holly, he was awaiting sentencing on charges to which he had pleaded guilty. Moreover, he believed that, at that time, Holly was being investigated for murder. Farver recalled that this murder investigation was related to the fact that Holly "had given a statement possibly [as a] primary or aiding and abetting a conspiracy that he was in a car, not the shooter, but he was busted with the gun." Farver testified that he did not form an opinion with respect to whether Holly could avail himself of his fifth amendment privilege in the petitioner's case.

In its findings, the habeas court did not discuss the significance of Farver's testimony, which was consistent with his representations at the time of the petitioner's second criminal trial, that Holly had represented to him that he would not testify even if he was ordered to do so. The habeas court, implicitly accepted as true Holly's testimony that he would have testified at the petitioner's trial if the court had rejected his invocation of his fifth amendment privilege, and resolved the fifth amendment issue by concluding that "there is no indication that Holly's testimony that he saw Ford with a gun on the day of the shooting would have exposed him to any criminal prosecution in the petitioner's [case] or any other case." The court also reasoned that Holly's fear of prosecutorial retaliation was not a valid ground upon which to invoke the fifth amendment privilege.

The evidence amply supported the court's finding that Holly had manifested his intention of invoking his fifth amendment right to remain silent if he was called as a witness at the petitioner's trial. The relevant legal principles related to the invocation of that right are well settled in our case law. "A court may not deny a witness' invocation of the fifth amendment privilege against compelled self-incrimination unless it is *perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have [a] tendency to incriminate. . . . To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. . . . In appraising a fifth amendment claim by a witness, a judge must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence. . . .

"[T]he right to one's privilege against prosecution that could result from the testimony sought does not depend upon the likelihood of prosecution but upon the *possibility* of prosecution. . . . [T]he trial court [is] obligated to assess only whether a possibility of

future prosecution [exists], or could arise, by virtue of the proffered testimony in light of existing law." (Citations omitted; emphasis in original; internal quotation marks omitted.) *In re Keijam T.*, 226 Conn. 497, 503–504, 628 A.2d 562 (1993). "The privilege afforded [by the fifth amendment] not only extends to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish *a link in the chain of evidence needed to prosecute* the claimant for a . . . crime." (Emphasis added.) *Hoffman* v. *United States*, 341 U.S. 479, 486, 71 S. Ct. 814, 95 L. Ed. 1118 (1951); see also *Malloy* v. *Hogan*, 378 U.S. 1, 12–13, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964); *State* v. *Valeriano*, 191 Conn. 659, 666, 468 A.2d 936 (1983), cert. denied, 466 U.S. 974, 104 S. Ct. 2351, 80 L. Ed. 2d 824 (1984); *State* v. *Ayuso*, 105 Conn. App. 305, 314, 937 A.2d 1211, cert. denied, 286 Conn. 911, 944 A.2d 983 (2008).

The respondent argues, and we agree, that the record before the habeas court precluded a careful consideration of all of the circumstances surrounding Holly's invocation of his fifth amendment privilege. Under *Strickland*, it was the petitioner's burden to prove that he was prejudiced by the deficient performance of his trial counsel. In the context of the present claim, that burden necessarily entailed demonstrating that Holly would have been unable to assert a fifth amendment privilege with respect to questions concerning his observations of Ford on the day of the shooting. Yet, the record presented before the habeas court does not reveal many details surrounding the serious legal matters that he faced at the time of the petitioner's second criminal trial. These matters included the robbery in the first degree and assault of a police officer charges to which he had pleaded guilty, as well as a pending investigation for murder.

Moreover, despite the scant information available to the trial court, the undisputed evidence concerning Holly's circumstances that *was* presented to the habeas court supported a conclusion that Holly's testimony about his interaction with Ford possibly incriminated Holly in criminal activity, regardless of whether such criminal activity was related directly to the petitioner's case or the incident at issue therein. As set forth previously, there was evidence that, at times relevant, Holly was the subject of an investigation for a murder that involved the use of a gun. The evidence suggested that he had pleaded guilty to charges of robbery in the first degree and assault of a police officer, but that the proceedings related to such charges had not concluded.

At the habeas trial, the petitioner relied on Holly's testimony to demonstrate that he was prejudiced by trial counsel's failure to present such testimony at his criminal trial. In his posttrial brief before the habeas court, the petitioner drew the attention of the habeas court to Holly's interaction with Ford, his observations

of the gun in Ford's possession, and his attempt to gain possession of the gun. Following his direct examination at the habeas trial, the petitioner's counsel asked Holly: "If you had testified, been brought to court and been ordered by the court to testify, would you have testified in the same manner then as you did today?" Holly replied, "Yes."

A review of Holly's testimony at the habeas trial readily reveals that he was asked questions that not merely called for him to describe his observations of and interaction with Ford on the day of the victim's murder, but that called for him to explain his familiarity with guns. Holly's examination at the habeas trial reveals the type of inquiry that he would have been subjected to at the petitioner's criminal trial and, thus, sheds light on the issue before us. At the habeas trial, Holly testified in relevant part that he observed Ford and the victim on the day of the shooting, when he was either sixteen or seventeen years of age. During his direct examination, the following colloquy occurred between Holly and the petitioner's counsel:

"Q. . . . Did [Ford] show you a weapon?

"A. Yes. I tried to take it from him.

"Q. What kind of a weapon did he show you?

"A. It was, like, an all black .380 or a nine millimeter.

"Q. Was it a pistol?

"A. Yes.

"Q. Was it a handgun?

"A. A handgun.

"Q. And you said it was either a nine millimeter or a .380?

"A. Yes.

"Q. And then what did you do when they showed or when Ralph Ford showed it to you?

"A. I asked to see it, for them to put it in my hand. And then he took off running."

Thereafter, the petitioner's counsel showed Holly a photograph of a gun and asked him to compare it with the one that he had observed in Ford's possession. Holly testified that the gun depicted in the photograph was similar to the one that Ford had showed him that day.

During cross-examination, the respondent's counsel asked Holly why he remembered his encounter with Ford. Holly replied that he remembered seeing Ford and the victim "because I tried to get the gun from them. I wanted that gun." Holly testified during cross-examination that Ford had showed him the gun, which was tucked into his waistband, by lifting his shirt. Holly stated that he told Ford to put the gun in his hand. He testified that he "tried to grab" Ford, who pulled away

from him. When the respondent's counsel asked Holly about the appearance of the gun, Holly stated: "*I know guns*. Yes, it was black. . . . I'd seen the clip of the gun. That's how I knew it was either a .380 or a nine millimeter." (Emphasis added.) When asked whether he had seen other young men in the Newhallville neighborhood with guns, Holly went on to testify: "If you were in the streets, you're going to see people with guns."

During redirect examination, Holly was asked once again to compare a photograph of a gun with the gun he had observed. Holly stated: "The gun Ralph Ford showed me looked like one of the guns I had before. That's why I thought it was real. That's why I tried to take it." When asked during further examination by the respondent's counsel about the characteristics of the gun in the photograph, Holly testified that he had seen similar guns, and that one of the characteristics of the gun in the photograph was uncommon. Specifically, Holly testified that he observed ridges on the top of the gun in Ford's possession, above the handle, which he considered to be an uncommon feature of the guns that he had seen.

At the habeas trial, the petitioner did not attempt to demonstrate that, if Holly had invoked his fifth amendment privilege at the time of the criminal trial, his testimony at the criminal trial would have been different from his testimony at the habeas trial. The petitioner, who bore the burden of proving deficient performance and prejudice in connection with trial counsel's failure to present Holly's testimony, appears to have relied on the entirety of Holly's testimony at the habeas trial to sustain his burden of proof. Thus, Holly's habeas testimony was presented as the type of inquiry to which Holly would have been subjected at the petitioner's trial. On the basis of that inquiry, as well as the evidence of the criminal issues that Holly faced at the time of the trial, it is reasonable to conclude that Holly would have been asked to provide answers that possibly would have furnished a link in the chain of evidence needed to prosecute him for one or more crimes.

The inquiries at issue called upon Holly to describe the basis of his ability to accurately characterize the gun in Ford's possession. In doing so at the habeas trial, Holly revealed that he wanted to gain possession of the gun on the day of the shooting, he attempted forcibly to gain possession of the gun on the day of the shooting, he was very familiar with guns, and he had possessed one or more guns prior to the day of the shooting. Against this evidentiary background, Ullmann's belief, that any inquiry about guns directed at Holly posed a danger to his penal interests, was eminently supported by the questions and answers that comprised Holly's examination at the habeas trial. Moreover, as Ullmann expressed, concerns that Holly's testimony possibly would have exposed him to criminal prosecution were

magnified in the present case in light of the fact that he was already the subject of criminal prosecution in the New Haven judicial district by the same prosecutor that was prosecuting the charges against the petitioner.

Although it appears that the habeas court thoroughly considered the evidence before it, it also appears from the analysis set forth in the court's memorandum of decision that the court took a narrow view of the fifth amendment issue, considering only whether Holly's *direct observations of Ford* likely would have subjected him to criminal prosecution, rather than whether it was possible that any questions asked of Holly during his direct or cross-examination could possibly have incriminated him in any other criminal prosecution. In light of the foregoing, we conclude that the court erred in its determination that Holly could not assert his fifth amendment privilege. It is not perfectly clear from all of the circumstances that Holly's testimony could not possibly have tended to incriminate him and, thus, possibly subject him to prosecution. Because the record reveals that it was likely that the court would have honored Holly's invocation of his fifth amendment privilege with respect to inquiries concerning his interaction with Ford on the day of the shooting, the petitioner cannot rely on Holly's testimony at the habeas trial, or any substantive portion thereof, to demonstrate harm.

In analyzing this claim, we have accepted as true the habeas court's unchallenged finding that Holly *would* have testified at the petitioner's criminal trial if he had been ordered to do so. Assuming, arguendo, that counsel's failure to present Holly's testimony was not the result of sound professional judgment, we conclude that such failure was not prejudicial to the petitioner. As we have explained in our analysis of this claim, it is speculative that the court, at the petitioner's criminal trial, would not have honored Holly's invocation of his privilege against self-incrimination with respect to inquiries concerning his interaction with Ford on the day of the shooting. On the scant record before us concerning Holly's pending matters at the time of the criminal trial, any attempt by this court to determine what portions of Holly's testimony, *if any*, would not have been subject to a specific claim of privilege and would have come before the jury would be speculative in nature.[12]

Moreover, setting aside any issues related to Holly's privilege against self-incrimination, it is purely speculative that any portions of Holly's testimony would have been *admissible* as evidence of third party culpability. With respect to the admissibility of third party culpability evidence, our Supreme Court has stated: "The admissibility of evidence of third party culpability is governed by the rules relating to relevancy. . . . Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determina-

tion of the proceeding more probable or less probable than it would be without the evidence. . . . Accordingly, in explaining the requirement that the proffered evidence establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party, we have stated [that] [s]uch evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of third party culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt. . . . In other words, evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination. A trial court's decision, therefore, that third party culpability evidence proffered by the defendant is admissible, necessarily entails a determination that the proffered evidence is relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt. . . .

"Whether a defendant has sufficiently established a direct connection between a third party and the crime with which the defendant has been charged is necessarily a fact intensive inquiry. In other cases, this court has found that proof of a third party's physical presence at a crime scene, combined with evidence indicating that the third party would have had the opportunity to commit the crime with which the defendant has been charged, can be a sufficiently direct connection for purposes of third party culpability. . . . Similarly, this court has found the direct connection threshold satisfied for purposes of third party culpability when physical evidence links a third party to a crime scene and there is a lack of similar physical evidence linking the charged defendant to the scene. . . . Finally, this court has found that statements by a victim that implicate the purported third party, combined with a lack of physical evidence linking the defendant to the crime with which he or she has been charged, can sufficiently establish a direct connection for third party culpability purposes." (Citations omitted; internal quotation marks omitted.) *State* v. *Baltas*, 311 Conn. 786, 810–12, 91 A.3d 384 (2014).

In the present case, the petitioner did not present any evidence that Ford was armed at the time of the shooting, physical evidence that tied Ford to the shooting scene, or a statement by the victim implicating Ford. Although the petitioner may have attempted to use Holly's testimony in an attempt to demonstrate that Ford was culpable for shooting the victim accidentally, there was no evidence that Ford had a motive to shoot the victim. In the absence of additional evidence tying Ford to the shooting, it is speculative whether the trial court

would have viewed Holly's testimony as proving a direct connection between Ford and the shooting, or whether it would have been viewed as evidence that supported a mere suspicion that he was implicated in the shooting.

Under *Strickland*, the petitioner failed in his burden of demonstrating that his trial counsel's failure to attempt to present Holly's testimony was prejudicial in that there was a reasonable probability that, absent such failure, the outcome of the trial would have been different.[13]

## II

Next, we consider the respondent's claim that the habeas court erroneously concluded that the petitioner was deprived of his right to the effective assistance of counsel by his counsel's failure to present evidence in support of an alibi defense that involved the testimony of Johnson and Allen to explain his whereabouts at the time of the shooting.[14] We agree with the respondent that the petitioner failed to demonstrate that counsel's strategic decision not to present the evidence at issue reflected deficient performance.

The respondent challenges the court's decision with respect to this aspect of the petitioner's ineffective assistance of counsel claim on a variety of grounds. The respondent argues that the court did not afford adequate consideration to evidence that defense counsel did not present the alibi evidence as part of an objectively reasonable overall trial strategy that was opposed to diverting the jury's attention away from the weaknesses of the state's case and, in particular, the significance of Ford's recantation at the time of the petitioner's second trial. Likewise, the respondent argues that the court did not afford adequate consideration to evidence that, apart from their overall trial strategy, defense counsel had specific concerns about the strength of the alibi evidence as well as its potential favorability to the state's case. Additionally, the respondent argues that the court erroneously concluded that there was a reasonable probability that, if the alibi evidence at issue had been presented to the jury, the result of the proceeding would have been different. Following a careful consideration of the claim, we agree with the respondent that the petitioner failed to demonstrate that counsel's strategic decision not to present the evidence at issue constituted deficient performance under the *Strickland* standard.

As stated previously in this opinion, to prevail under *Strickland*, "the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Internal quotation marks omitted.) *Michael T.* v. *Commissioner of Correction*, supra, 319 Conn. 631. "With respect to the performance prong of *Strickland*,

we are mindful that [j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a *strong presumption* that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . .

"Similarly, the United States Supreme Court has emphasized that a reviewing court is required not simply to give [the trial attorney] the benefit of the doubt . . . but to affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as [he] did . . . . [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 632–33.

"Although courts may not indulge post hoc rationalization for counsel's decisionmaking that contradicts the available evidence of counsel's actions . . . neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect. . . . After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." (Citations omitted; internal quotation marks omitted.) *Harrington* v. *Richter*, 562 U.S. 86, 109–10, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). The presumption that counsel has acted reasonably may be overcome by a showing that there was no conceivable tactical justification for counsel's strategy. See, e.g., *Holloway* v. *Com-*

*missioner of Correction*, 145 Conn. App. 353, 367, 77 A.3d 777 (2013).

At the habeas trial, Merkin testified that the defense strategy was to discredit Ford's credibility and to challenge the strength of the state's case, particularly with respect to the state's evidence identifying the petitioner as the shooter. Merkin testified that the defense attempted to challenge Ford's earlier statements to the police, in which he implicated the petitioner, as being inherently unreliable. Merkin explained: "Part of our theory was that [Ford] wasn't in a location where he could see what he claimed to have seen. Part of it was that he was very coercively, in our view, interrogated by the lead detective in the case in the middle of the night, and therefore the information he gave was not reliable. And part of it was that we had some suspicion or belief that he was actually involved himself, whether accidentally or otherwise killing his friend." Merkin acknowledged, however, that defense counsel had not developed enough evidence to support the latter part of the defense strategy. Consistent with Merkin's testimony, the court found that Merkin "does not like alibi defenses generally, and her practice was not to present an alibi defense unless it was rock solid."[15]

The court found that, through defense investigation, defense counsel became aware of the potential trial testimony of Johnson and Allen, and that defense counsel had found Johnson and Allen to be credible witnesses. The court observed that Merkin decided not to present the testimony of Johnson because she did not believe it was strong evidence. In this regard, the court referred to Merkin's opinions that Johnson was not a disinterested witness because she was the petitioner's sister, Johnson's testimony supported a finding that the petitioner was close to the crime scene at the time that the shooting occurred, and it was unclear from Johnson's testimony whether the petitioner was able directly to observe the petitioner at all times relevant. With respect to Allen, the court referred to Merkin's opinions that Allen's testimony was not strong because she merely had estimated the timing of the telephone calls involving the petitioner, and that the testimony was potentially more favorable to the state's case, particularly in light of the fact that the evidence would have placed the petitioner in close proximity to the crime scene at the time that the shooting occurred.[16]

Consistent with the testimony of Merkin and Jones, the court recognized that trial counsel's failure to present the testimony of Johnson and Allen was not inadvertent, but the result of a considered trial strategy. In general terms, the strategy was designed to focus the jury's attention on weaknesses in the state's case, particularly the fact that Ford had recanted his earlier statements in which he had identified the petitioner as being present at the scene of the crime with a gun. In

this general sense, defense counsel did not want the jury to focus on possible weaknesses in its alibi defense or to afford the prosecutor an opportunity to draw the jury's attention away from the state's case. In specific terms, defense counsel also expressed concerns that were directly related to potential issues with the strength of the potential testimony of Johnson and Allen, as well as concerns that their testimony, if found to be credible by the jury, had the potential to assist the state by demonstrating that, at or around the time of the shooting, the petitioner was at his residence, just two blocks away from the crime scene.

The court, however, did not view defense counsel's general strategic decision to be reasonable because, as it found, the alibi testimony at issue "would have been helpful to the petitioner's defense that he was at home at the time of the shooting." The court did not appear to afford any deference to defense counsel's concern that presenting the alibi defense would have diverted the jury's attention away from the weaknesses of the state's case, particularly in light of the fact that Merkin believed that the defense had done a "very good job" in undermining Ford's identification of the petitioner. Additionally, rather than evaluating whether there existed conceivable tactical justifications for counsel's assessment of the alibi evidence, the court set forth a number of reasons as to why it did not share trial counsel's concerns about the strength of the alibi testimony. For example, the court, relying on Johnson's testimony, determined that she was able to provide a strong alibi for the petitioner despite the fact that the petitioner was not in her direct view at times relevant.[17] The court determined that any confusion concerning the timing of calls made between Allen and the petitioner could have been resolved by means of evidence obtained from the caller identification feature on Allen's telephone.[18] Moreover, the court determined that counsel's concern that the alibi evidence would have placed the petitioner close to the crime scene at the time of the shooting was unfounded because there was what it considered to be evidence of a similar nature before the jury, namely, evidence that the petitioner was at Southern Connecticut State University shortly before 11 p.m. on the night of the shooting.[19]

Affording plenary review to the issue, we conclude that the representation that the defendant was afforded was constitutionally adequate. The petitioner has failed to sustain his evidentiary burden of demonstrating that, under all of the circumstances, defense counsel's strategic decision not to present the alibi defense was not objectively reasonable. Here, defense counsel described at length the reasons underlying their decision not to present the alibi evidence, and the court found that the decision was not the product of neglect, but strategy. It is not the role of a reviewing court to second-guess the myriad of considerations that underlie

a trial strategy in an attempt to determine with the benefit of hindsight whether it would have made the exact same strategic decisions. Rather, a reviewing court must determine whether, at the time of trial, conceivable justifications existed for the tactical decisions that were made by counsel.

"Our review of an attorney's performance is especially deferential when his or her decisions are the result of relevant strategic analysis. . . . Thus, [a]s a general rule, a habeas petitioner will be able to demonstrate that trial counsel's decisions were objectively unreasonable only if there [was] no . . . tactical justification for the course taken. . . .

"[T]he presentation of testimonial evidence is a matter of trial strategy. . . . Defense counsel will be deemed ineffective only when it is shown that a defendant has informed his attorney of the existence of a witness and that the attorney . . . without adequate explanation . . . failed to call the witness at trial. . . . Furthermore, [t]he failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense. . . .

"[O]ur habeas corpus jurisprudence reveals several scenarios in which courts will not second-guess defense counsel's decision not to investigate or call certain witnesses or to investigate potential defenses, such as when . . . counsel learns of the substance of the witness' testimony and determines that calling that witness is unnecessary or potentially harmful to the case . . . . Thus, an attorney's choice to pursue a defense that focuses on casting doubt on the state's case rather than on calling his or her own witnesses can be a reasonable choice." (Citations omitted; internal quotation marks omitted.) *Spearman* v. *Commissioner of Correction*, 164 Conn. App. 530, 541,    A.3d    (2016). As the United States Supreme Court has observed, "To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." *Harrington* v. *Richter*, supra, 562 U.S. 109.

The petitioner failed to demonstrate that defense counsel's general strategy to keep the jury's focus on weaknesses in the state's case, instead of diverting focus to an alibi defense, was unreasonable under the circumstances. This is particularly true in light of the weakness in the state's case following Ford's recantation. Moreover, even if the petitioner could demonstrate that such a general strategic decision was unreasonable, in the present case, defense counsel raised many reasonable concerns about the overall strength of the alibi evidence, including its potential to benefit the state's case by placing the petitioner near the scene of the

crime at the time that it was committed. The petitioner has failed to demonstrate that, as a whole, these specific reasons related to defense counsel's evaluation and assessment of the alibi evidence did not reflect sound professional judgment.[20] The fact that this was not the only reasonable trial strategy that was available to counsel, or that it ultimately was not successful, is not dispositive of the issue of whether the strategy employed was objectively reasonable. Employing the strong presumption that counsel's conduct reflected reasonable representation, as we must, we conclude that the petitioner failed to satisfy his burden under *Strickland*'s first prong.

The judgment is reversed only with respect to the count alleging ineffective assistance of counsel and the case is remanded to the habeas court with direction to deny the petition for a writ of habeas corpus on that count. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] "The record reveals that the area of New Haven where most of the pertinent events occurred is called Newhallville and is a block-shaped area formed around the intersections of Read, Shepard, Huntington and Newhall Streets." *State* v. *Johnson*, supra, 288 Conn. 239 n.4.

[2] "L'Kaya Ford and Ralph Ford are not related." *State* v. *Johnson*, supra, 288 Conn. 239 n.5.

[3] "The victim told police investigating the incident that the [petitioner] did not have a weapon. A witness, Dwana Wilson, however, saw the encounter from across the street and testified that she had witnessed the [petitioner] holding a black handgun and pointing it at the victim." *State* v. *Johnson*, supra, 288 Conn. 239 n.6.

[4] "Ralph Ford did not explain why he did not remain with the victim and take the usual shortcut home that night, other than indicating that he liked to walk on Read Street." *State* v. *Johnson*, supra, 288 Conn. 241 n.7.

[5] "Ralph Ford, the state's key identification witness, recanted his testimony from the [petitioner's] first trial at the [petitioner's] retrial, but his prior inconsistent statements were used to impeach him at the second trial and admitted as substantive evidence . . . ." *State* v. *Johnson*, supra, 288 Conn. 241 n.8.

[6] "At trial, Toles testified that, earlier that day, she had seen the [petitioner] in a cranberry colored car that she believed was a Dodge Intrepid. The [petitioner] was a passenger in the car and was accompanied by two other people." *State* v. *Johnson*, supra, 288 Conn. 241 n.9.

[7] "There was conflicting testimony at trial about the clothes that the [petitioner] was seen wearing on the night the victim was shot. Toles observed him around 11 p.m. wearing '[a] black T-shirt, some blue jeans, a black leather coat, and black Jordan sneakers.' Ralph Ford's testimony from the [petitioner's] first trial was read into evidence at the second trial, and he testified that, when he saw the [petitioner] running across Huntington Street from the direction of the gunshot, the [petitioner] was wearing blue jeans, a grey hooded sweatshirt with orange stripes on the sleeves, and black boots." *State* v. *Johnson*, supra, 288 Conn. 242 n.10.

[8] "Toles did not see what car, if any, the [petitioner] and Scott arrived in that evening." *State* v. *Johnson*, supra, 288 Conn. 242 n.11.

[9] "The police, relying on information received and the identifications made by Ralph Ford and L'Kaya Ford, secured a search warrant for the [petitioner's] residence and seized a .45 caliber handgun. Ballistics testing confirmed that the gun seized from the [petitioner's] home was not the gun used to kill the victim. The parties stipulated at trial that there was no record of a permit in the defendant's name to carry a handgun. The police also seized a pair of black, high-top sneakers from the [petitioner's] home but did not find a gray sweatshirt with orange stripes or blue jeans." *State* v. *Johnson*, supra, 288 Conn. 243 n.12.

[10] Also, the petitioner alleged that counsel rendered deficient representation in that they had failed to present testimony of a Jermaine Diggs, who was not called as a witness at the habeas trial. The habeas court determined

that the petitioner abandoned this aspect of his claim of ineffective assistance.

[11] Allen testified that she was driving a van when she picked up the petitioner.

[12] The petitioner presented Holly's testimony before the habeas court as evidence of prejudice. Before this court, the petitioner observes that, at the time of the criminal trial, the court could have ordered Holly to testify while restricting direct and cross-examination of him in such a manner as to protect his right against self-incrimination. Thus, the petitioner argues that Holly's testimony at the criminal trial "could have been limited to the sole issue of his having seen Ford with a gun similar to that used to kill the victim near the time of the shooting." The petitioner argues that Holly "would have been required to answer questions about having seen Ford with a gun and asking him to describe the gun, even if he would have been permitted to invoke the privilege in response to questions about trying to take the gun." The petitioner's argument in this regard is based on his assertion that "it is perfectly clear from all of the facts presented at the habeas trial that answers from Holly to questions calling for information about his having seen a gun and a description of that gun could not possibly have any tendency to incriminate him."

Holly was not called as a witness at the petitioner's criminal trial and, at the habeas trial, Holly testified without invoking his privilege against self-incrimination. A hearing concerning what inquiries, if any, would have been precluded by the exercise of Holly's privilege did not occur in this case. Thus, the petitioner invites this court to speculate with respect to the portion of that testimony that the petitioner would have been compelled to provide consistent with the invocation of his privilege. A court's evaluation of whether to preclude the exercise of the fundamental constitutional right at issue is inherently fact-bound. "To sustain the privilege [against self-incrimination], it need only be evident from the implications of the question, in the context in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. . . . Conversely, before refusing to allow the privilege, the trial court must find that the answers to any questions proposed cannot possibly have a tendency to incriminate. . . . The privilege against self-incrimination depends on the mere possibility of prosecution." (Citations omitted; internal quotation marks omitted.) *State* v. *Cecarelli*, 32 Conn. App. 811, 819, 631 A.2d 862 (1993). We reject the petitioner's argument. In the absence of a factual record that provides far greater information concerning the matters pending against Holly at the time of the criminal trial, it is not perfectly clear that any testimony from Holly in which he described his interaction with Ford and his observations of Ford's gun could not possibly have any tendency to incriminate him. If it would have been feasible and likely for the court to have limited the inquiries of Holly in the manner suggested by the petitioner, it was the petitioner's burden to demonstrate this fact before the habeas court on the basis of adequate facts. We reiterate that it was the petitioner's burden to create a factual record to demonstrate that Holly would not have been permitted to exercise his privilege against self-incrimination with respect to evidence helpful to the petitioner.

[13] As discussed previously in this opinion, the petitioner relies on Holly's testimony before the habeas court to demonstrate that, under *Strickland*, he was prejudiced by counsel's failure to present Holly's testimony at his criminal trial. Alternatively, the petitioner argues that this court "should hold that [he] need not prove prejudice because [his] trial counsel's failure to present evidence of third party culpability through . . . Holly was an adverse effect of counsel's conflict of interest."

This conflict of interest claim was raised before and rejected on its merits by the habeas court. In relevant part, the court stated: "[T]he petitioner alleges that trial counsel had a duty to present Holly and Inspector Whalen as witnesses to testify at the second trial as to Holly's statement that he saw Ford in possession of a pistol matching the description of the murder weapon [on] the day of the shooting. The petitioner further claims that trial counsel failed to present this testimony because Attorney Ullmann, the head of the New Haven public defender's office and trial counsel's supervisor, represented Holly in an unrelated [matter] and advised Holly not to cooperate with the petitioner's defense. This, he claims, constituted a conflict of interest.

\*\*\*

"At the time of the petitioner's second criminal trial, Holly had a criminal

matter pending that was unrelated to the petitioner's case. Attorney Ullmann represented Holly in that matter. Inspector Whalen contacted Holly on behalf of the petitioner's defense, and Holly informed him that he had seen Ford with a handgun with a description similar to the murder weapon. Attorney Ullmann advised Holly not to testify at the petitioner's criminal trial because the same prosecutor was handling both the petitioner's case and Holly's pending case, and he did not want the prosecutor to retaliate against Holly in his case for assisting the petitioner's defense. Attorney Ullmann subsequently appointed a private attorney, Attorney Farver, to represent Holly with respect to Holly's involvement in the petitioner's case. Both Attorney Jones' and Attorney Merkin's decision not to call Holly as a witness at the petitioner's trial was not impacted by the fact that Attorney Ullmann was their supervisor, and had advised Holly not to testify. . . .

"[A]n actual conflict of interest does not arise in the present case solely because trial counsel and Attorney Ullmann worked in the same government office while representing parties with adverse interests. Further, the court finds no specific instances in which the petitioner's interests have been adversely affected by trial counsel's representation. Attorney Ullmann appointed a private attorney to represent Holly with respect to the petitioner's case to avoid any potential conflict, and both Attorney Jones and Attorney Merkin testified that Attorney Ullmann's status as their supervisor or [his] position as to Holly's testimony did not impact their decision not to call him as a witness in the petitioner's second trial. Accordingly, the petitioner has failed to prove his actual conflict of interest claim."

In arguing before this court that a conflict of interest actually existed that obviated the requirement that he prove that he was prejudiced by defense counsel's failure to present Holly's testimony, the petitioner argues that the habeas court erred in its critical finding that Ullmann did not have any adverse effect on defense counsel's representation of him, and that Ullmann did not impact their decision not to present Holly's testimony. The petitioner's argument with respect to an actual conflict of interest on the part of defense counsel is not persuasive. Before this court, the petitioner calls into question the factual determinations of the habeas court with respect to defense counsel's loyalties and their decision-making concerning Holly. His arguments fail because the court's unambiguous factual findings in this regard are amply supported by the testimony presented at the habeas trial.

[14] In his brief before this court, the petitioner asserts that the judgment of the habeas court may be supported by the fact that defense counsel "failed to adequately investigate the strength of the petitioner's alibi." He argues that "trial counsel failed to adequately investigate the strength of the alibi witnesses" and "had no reasonable basis to stop investigating before discovering [relevant] facts" related to their testimony. The petitioner argued that, had defense counsel questioned Johnson adequately, they would have learned that he could not have left his residence without alerting her that he was doing so.

The petitioner's arguments that are based upon an inadequate investigation are not properly before us. In his amended petition for a writ of habeas corpus, the pleading that framed the issues before the court, the petitioner did not set forth allegations related to deficiencies in defense counsel's investigation of the alibi witnesses. Rather, he alleged that defense counsel had "failed to present" the testimony of Johnson and Allen. Moreover, the habeas court's memorandum of decision does not reflect that the court considered on its merits any claim related to inadequate investigation of the witnesses at issue. The court stated among its many findings that, at the habeas trial, defense counsel "acknowledged . . . that they failed to investigate Johnson's ability to provide an alibi at the times when the petitioner was not in her direct view." There is nothing in the court's decision to reflect, however, that the court based its decision on that isolated finding or any theory of the case related to defense counsel's investigation. Consistent with the grounds set forth in the amended petition for a writ of habeas corpus, the court stated that the issue before it was the petitioner's claim "that trial counsel were ineffective for failing to call Johnson and Allen as witnesses to testify that he was at home at the time of the shooting in support of an alibi defense."

This is not one of the rare cases in which, in the absence of an amendment to the operative pleadings, a lower court has considered, or granted relief, on the basis of a technically unpleaded claim that was actually litigated at trial. See *Stafford Higgins Industries, Inc.* v. *Norwalk*, 245 Conn. 551, 575, 715 A.2d 46 (1998). "It is well settled that [t]he petition for a writ of habeas corpus is essentially a pleading and, as such, it should conform generally to a complaint in a civil action. . . . The principle that a [petitioner] may rely only upon what he has alleged is basic. . . . It is fundamental in our law that the right of a [petitioner] to recover is limited to the allegations

of his complaint. . . . While the habeas court has considerable discretion to frame a remedy that is commensurate with the scope of the established constitutional violations . . . it does not have the discretion to look beyond the pleadings and trial evidence to decide claims not raised. . . . This court is not bound to consider claimed errors unless it appears on the record that the question was distinctly raised . . . and was ruled upon and decided by the court adversely to the [petitioner's] claim. . . . This court is not compelled to consider issues neither alleged in the habeas petition nor considered at the habeas proceeding . . . ." (Citation omitted; internal quotation marks omitted.) *Greene* v. *Commissioner of Correction*, 131 Conn. App. 820, 822, 29 A.3d 171 (2011), cert. denied, 303 Conn. 936, 36 A.3d 695 (2012); see also *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 580, 941 A.2d 248 (2008). In conformity with this principle of appellate review, we decline to address on their merits any arguments related to the alleged deficient performance of defense counsel in failing to properly investigate the strength of the alibi witnesses' potential testimony.

[15] In this regard, Merkin testified: "It was my belief . . . from years of doing this type of work . . . that unless they are solid, [alibis] can get you into trouble. It's the last thing the jury hears if you have a good prosecutor who's a good cross-examiner and can try to kind of attack either a family member who's an alibi witness or some other vulnerability to the alibi. To me, it pulls attention away from the weaknesses in the state's case, and it kind of develops jurors' focus on the weaknesses in the alibi. So, it's just been my practice to shy away from alibis unless they're solid, and I had some concerns about the alibi in this case."

Similarly, Merkin stated: "I know that there's a difference of opinion on this . . . . My opinion is that if you put alibi evidence on which has vulnerabilities, after the state's sole eyewitness testifies . . . the last piece of the case that the jury is left with is a weak or possibly problematic alibi, and it draws the jury's attention away from the weaknesses in the state's case. Jurors aren't supposed to shift burdens and things of that sort, but it's my opinion that . . . if they're presented with alibi evidence that's not solid, their focus kind of gets taken away from the weaknesses in the state's case."

[16] Defense counsel did not testify that they disbelieved Johnson or Allen. Merkin testified that she had a wide range of concerns with respect to presenting the testimony of Johnson and Allen in support of an alibi defense. Merkin explained that Johnson was not a disinterested witness, but a family member of the petitioner; the alibi evidence would have demonstrated that the petitioner was close to the scene of the shooting at the time that the shooting occurred; and she believed that Johnson's testimony was not strong because Johnson had not informed the police about the petitioner's whereabouts. Merkin also explained that Johnson was not always consistent with respect to when she had observed the petitioner leave the residence, and that she did not believe that Johnson's version of events would withstand a thorough cross-examination because it would have been relatively easy for a skilled prosecutor to draw the jury's attention to the fact that she did not directly observe the petitioner at all times relevant. She stated that the fact that Johnson was unable to testify that she directly had observed the petitioner in her residence at the time of the shooting was a deficiency in the alibi.

Merkin explained that because of uncertainties in Allen's testimony, she was not satisfied that it would have precluded the jury from finding that the petitioner committed the shooting and, in any event, it demonstrated that he was in close proximity to the crime scene at the time of the shooting. Moreover, Merkin believed that Allen's testimony was not favorable to the extent that it essentially demonstrated that the petitioner had asked Allen to drive him away from the general area of the crime scene at a late hour of the day. With respect to this last observation, Merkin testified that she had concerns that such evidence would have permitted the state to seek an instruction concerning evidence of flight and consciousness of guilt, to the petitioner's detriment. She stated: "I didn't like that because the jurors could infer that he had maybe done the shooting and was taking off [with Allen]."

Repeatedly, Merkin indicated that she deemed the fact that the alibi evidence would have placed the petitioner near the scene of the shooting to be an important factor that mitigated against presenting the evidence at issue. Despite her reservations about alibi defenses, Merkin testified that if the alibi evidence had placed the petitioner farther away from the scene of the crime she would not have "struggled" with the decision whether to present the evidence. Merkin testified that if Johnson and Allen could have supported an alibi that was "connected to a location miles away from the

crime . . . the balance for me would have tipped in favor of putting that defense on in front of this jury."

In his testimony before the habeas court, Jones discussed the general defense strategy of focusing on the weakness of Ford's identification of the petitioner. Jones shared some of Merkin's concerns with respect to the strength of the alibi evidence, particularly the concern that the evidence did not provide a rock-solid alibi that, if believed, precluded a finding that the petitioner could have committed the crime. Jones observed that the alibi evidence would have placed the petitioner at his home, which was located mere blocks from the crime scene. Jones expressed his concern that, even if the alibi evidence had been presented to the jury, the jury could have found it plausible that the petitioner had the opportunity to commit the crime. Jones, like Merkin, wrestled with the issue of whether it was a good strategy to divert the jury's attention to an alibi defense, but he indicated that he favored presenting the alibi evidence. Despite this disagreement with her as to trial strategy, he viewed Merkin as an excellent trial attorney and agreed with her overall assessment of the weaknesses in the state's case.

[17] In this regard, the court appears to have relied on Johnson's testimony that, even if she was not able to directly view the petitioner, she would have been able to determine if he had left the residence because she would have heard the kitchen door open and would have noticed if the motion-activated light outside of her residence had been activated by his movement. The court found, and the evidence reflects, that defense counsel did not investigate Johnson's testimony in this regard. Even if defense counsel had been aware of this explanation from her, however, it would not have been unreasonable for counsel, in the exercise of sound professional judgment, to determine that the evidence was not persuasive in nature.

[18] Although the court appears to have determined that the defense could have presented evidence of this nature with respect to *all* calls made between the petitioner and Allen on the night of the shooting, Allen testified that the caller identification system on her telephone contained information about the telephone calls that the petitioner made to her. Allen testified that the system did not have information about the timing of the telephone calls that she allegedly had made to the petitioner closer to the suspected time of the shooting. Thus, the evidence presented at the habeas trial did not undermine the sound strategic reasons articulated by Merkin for not presenting Allen's testimony.

[19] There was evidence that the shooting occurred between 10:20 and 10:30 p.m. There was evidence that the petitioner's residence was within two blocks of the crime scene and that it took the petitioner several minutes to drive to Southern Connecticut State University from his residence. Thus, the evidence showing that the petitioner was at Southern Connecticut State University shortly before 11 p.m. is not as potentially incriminating as the alibi evidence that would have placed the petitioner at his residence, just two blocks from the crime scene, at a time that was much closer to the suspected time of the shooting.

[20] Although the court did not refer to it when assessing the reasonableness of defense counsel's strategic decision not to present Johnson's testimony, we note that an excerpt from one of the police incident reports that was introduced as an exhibit during the habeas trial reflects that, on the day following the shooting, the petitioner, after signing a waiver of rights form, told the police that he was home at his residence on Butler Street the night before, but he "could not remember who was home or saw him."

---